UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLORADO

| | |
|---|---|
| PAUL JOHNSTON,<br><br>Plaintiff,<br><br>v.<br><br>BIOMET, INC.; BIOMET ORTHOPEDICS, LLC; and BIOMET U.S. RECONSTRUCTION, LLC;<br><br>Defendants. | Court File No.<br><br>**COMPLAINT -<br>JURY TRIAL DEMAND** |

## CIVIL COMPLAINT

Plaintiff, PAUL JOHNSTON, residing at P.O. Box 4403, Aspen, Co, Pitkin County, in the state of Colorado, by and through Plaintiff's attorneys, AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC, upon information and belief, and at all times hereinafter mentioned, alleges as follows:

### INTRODUCTION AND SUMMARY OF ACTION

1.      For numerous years, Defendants have known that their hip replacement device—the M2A-38 Hip Replacement System (hereafter, the "Device")—is prone to fail years before its expected life.  They have also known that the implant's metal "ball" and "socket" bearings that make up the hip-joint generate metal debris over time from wear and tear that can spread throughout the patient's surrounding bone and tissue.  As a result of these defects, patients that have had the devices implanted have endured, or will endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation, causing damage or death to surrounding tissue and bone; and a subsequent more difficult revision surgery to replace the faulty devices, giving rise to still more debilitation, a prolonged recovery time, and an increased risk of complications and

death from surgery.  But rather than recalling the Device upon receiving notice of complaints made to the United States Food and Drug Administration ("FDA") regarding the defects discussed above, or warning physicians and patients of these risks and precautions such as metal level monitoring, Defendants continued to aggressively market the Device, claiming it was a safe and effective hip replacement system.  Indeed, Defendants sought to capitalize on the problems with the competitor devices by asserting the superiority of the Device.

2.     Plaintiff's suffering could easily have been prevented.  Plaintiff would not have suffered from unnecessary pain and debilitation, as well as the need to undergo subsequent revision surgery, had Defendants taken the affirmative step of recalling the Device, when dozens of complaints began being made to the FDA regarding the Device's failures, or had Defendants at least warned the orthopedic surgical community and the public of the dangers of the Device so that those who had the Device implanted could be medically monitored for signs of the Device malfunctioning including loosening and metal debris related injury.  Plaintiff seeks redress for Plaintiff's injuries.

3.     Plaintiff brings this action under the laws of the state of Colorado.

## PARTIES

4.     Plaintiff is over the age of majority and is a citizen and resident of the state of Colorado.  Plaintiff has been injured due to a defective medical prosthesis manufactured by Defendants.

5.     Defendant, BIOMET, INC. is, and at all times relevant to this Complaint was, an Indiana Corporation with its principal place of business in Warsaw, Indiana 46582.  Defendant, BIOMET, INC., is and was at all times relevant herein doing business in and/or having direct its activities in the State of Colorado.

6.      Defendant, BIOMET INC., designed, manufactured, marketed, promoted, and sold the M2a-38 Hip system that is the subject of this lawsuit.

7.       Defendant, BIOMET ORTHOPEDICS, LLC, is, and at all times relevant to this Complaint was, a wholly owned subsidiary of Defendant, BIOMET, INC., an Indiana Corporation with its principal place of business in Warsaw, Indiana.   The sole member of Defendant BIOMET ORTHOPEDICS, LLC, is Defendant BIOMET INC., which is a resident of Indiana. Accordingly, the citizenship of Defendant BIOMET ORTHOPEDICS, LLC, is Indiana. Defendant, BIOMET ORTHOPEDICS, LLC, is and was at all times relevant herein doing business in and/or having direct its activities in the State of Colorado.

8.      Defendant, BIOMET ORTHOPEDICS, LLC, designed, manufactured, marketed, promoted, and sold the M2a-38 Hip system that is the subject of this lawsuit.

9.      Defendant, BIOMET ORTHOPEDICS, LLC, is, and at all times relevant to this Complaint was, a wholly owned subsidiary of Defendant BIOMET U.S. RECONSTRUCTION, LLC, an Indiana Corporation with its principal place of business in Warsaw, Indiana.

10.      Defendant, BIOMET U.S. RECONSTRUCTION, LLC, is, and at all times relevant to this Complaint was, a wholly owned subsidiary of Defendant BIOMET, INC., an Indiana Corporation with its principal place of business in Warsaw, Indiana. The sole member of Defendant BIOMET U.S. RECONSTRUCTION, LLC, is Defendant BIOMET INC., which is a resident of Indiana. Accordingly, the citizenship of Defendant BIOMET U.S. RECONSTRUCTION, LLC, is Indiana. Defendant, BIOMET U.S. RECONSTRUCTION, LLC, is and was at all times relevant herein doing business in and/or having direct its activities in the State of Colorado.

11.     Defendants, BIOMET, INC.; BIOMET ORTHOPEDICS, LLC; BIOMET U.S. RECONSTRUCTION, LLC, are collectively referred to herein as "Biomet" or Defendants.

12.     At all times relevant herein, Defendants were the agents of each other, and in doing the things alleged herein, each defendant was acting within the course and scope of its agency and was subject to and under the supervision of its Codefendants.

13.     Upon information and belief, at all times herein mentioned, the employees of all Defendants, their subsidiaries, affiliates, and other related entities, as well as the employees of the Defendants' subsidiaries, affiliates, and other related entities, were the agents, servants and employees of Defendants, and at all relevant times, were acting within the purpose and scope of said agency and employment.  Whenever reference in this Complaint is made to any act or transaction of Defendants, such allegations shall be deemed to mean that the principals, officers, employees, agents, and/or representatives of the Defendants committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of Defendants while actively engaged in the scope of their duties.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     Venue is proper in this district pursuant to 28 U.S.C. §1961, *et seq*., because a substantial part of the events giving rise to this claim occurred in Colorado and this district.

## FACTUAL ALLEGATIONS

**THE BIOMET DEFENDANTS MANUFACTURED AND MARKETED THE M2A-38 HIP REPLACEMENT SYSTEM, THE DEVICE, TO THE PUBLIC, EVEN**

**THOUGH THEY KNEW, OR SHOULD HAVE KNOWN, OF THE DANGER THAT THE DEVICE POSED TO THE PUBLIC.**

16.     The Device was developed in order to reconstruct human hip joints that are diseased due to conditions, such as osteoarthritis, rheumatoid arthritis, avascular necrosis (AVN), or fracture.  The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis. The hip joint is like a ball that fits in a socket. The socket portion of the hip is called the acetabulum.  The femoral head at the top of the femur bone rotates within the curved surface of the acetabulum.

17.     A total hip replacement implant device typically consists of four separate components: a femoral stem, a femoral head (or ball), a liner, and an acetabular shell (socket). Usually these components are made of metal and plastic.

18.     The M2A-38 Hip Replacement System (Device) has only three components: a metal femoral head, a metal taper insert, and a metal acetabulum cup.  The metal femoral head can be attached to a femoral stem to complete a total hip replacement.  As a result of the use of metal in the ball, taper insert, and socket components, the device is referred to by the industry as a Metal-on-Metal (MoM) Implant Device.

19.     These devices were marketed with the claim that they would last much longer than the conventional hip implant with a polyethylene liner.  Indeed, Defendants marketed the 38 Device as having many advantages over other hip replacements or hip resurfacing systems. Defendants advertised that "range of motion studies performed on the M2A-38 suggests an average of 154 degrees range of motion – this is more than any other metal-on-metal system on the market", and that "the plasma spray porous coating is more than twice as resistant to cup displacement under rim load than other coatings."

20.     When initially released, Defendants promoted the device as a metal-on-metal articulation achieving "maximum range of motion, stability, and minimal wear." They advertised that "the large 38mm bearing surface exhibits similar wear characteristics to that of the 28mm and the 32 mm metal-on-metal articulations, approximately 1/350th the wear of metal-on-polyethylene."

21.     Even as other MoM devices came under scrutiny for their high rates of failure over the years, Defendants continued to falsely advertise the Device as a superior and safe device, citing biased and misleading studies and data indicating that the hip replacement was subject to reduced wear and revision.

22.     Contrary to what Defendants' marketing campaigns suggest, for many years Defendants have known of the risks inherent in MoM devices, including the M2A-38 Hip Replacement System. Specifically, for several years, the FDA had been receiving complaints that the Device prematurely failed in some patients, due to component loosening, dislocation, component wear, and fracture, as a result of the design of the device.  In addition, reports were received that the implant's "ball" and "socket"—which are both metal bearings—generate metal debris over time from normal wear, and this debris can spread throughout the surrounding bone and tissue causing severe inflammation and damage.

23.     Defendants were aware that the British Medicines and Healthcare Products Regulatory Agency (MHRA) and the United States Food and Drug Administration expressed concern about Metal-on-Metal hips and the impact of metal ions and thus Defendants, as part of industry trade groups, participated in discussion of studies of the health effects with other manufacturers during that time period.

24.     Defendants reason to conceal the defect in its M2A-38 Hip Replacement System is clear. Hip implant sales are critically important to Defendants. During the time period relevant to this Complaint, Defendants' management was trying to make Defendants look appealing to investors, and in 2007, they were ultimately purchased by a private equity firm for $10 billion.

25.     Defendants were faced with a critical defect in one of its most profitable hip implant systems.  Rather than to admit that these popular products had a critical defect that could cause a premature failure, forcing patients to have to undergo another painful surgery, Defendants chose to pursue corporate profits, at the expense of patient safety, and continued to promote, market, and sell the Device despite the fact that they knew the product was defective. To this day, Defendants continue to sell these defective implants to unsuspecting patients without any warning about the risks or the failures that have been reported to the company.

26.     In 2011, the Australian Orthopedic Association published its annual report on data collected from the Australian National Joint Registry, which tracks surgical revisions of orthopedic devices in Australia (the United States does not have such a registry).  The Report showed that the Device had a yearly cumulative revision rate of 7.2% after seven years, with a statistical range of 5.3% and 9.7%.  This is a much higher revision rate than some other MoM hip replacements.

27.     In May of 2011, the FDA required Defendants, and other manufacturers, to provide data on levels of metal in the blood of patients implanted with their MoM hip implants due to rising concerns regarding their use.  The request followed the release of British studies from March 2010 showing that MoM implants, such as the Device, are potentially dangerous because they can generate large amounts of metallic debris as they wear over time.  Metallic debris has been shown to cause severe inflammatory responses in some patients, resulting in pain

in the groin, death of tissue in the hip joint, and loss of surrounding bone.  These injuries often require revision surgery to replace the device before its expected expiration.

28.     In a systematic review of clinical trials, observational studies, and registries conducted by the FDA and published in the British Medical Journal on November 29, 2011, it was found that MoM hip implants are no more effective than traditional polyethylene-lined implants, and increase the risk of revision surgery.  Therefore, MoM hip implants increase the safety risk to patients without providing any benefit over traditional hip implants.  Due to this poor risk-benefit profile, sales of the Device have decreased substantially.

29.     As a result of the issues with the Device, recipients of the Device have suffered symptoms including pain, swelling, inflammation, and damage to surrounding bone and tissue, and lack of mobility.  As noted above, these symptoms are the result of possible loosening of the implant, where the implant does not stay attached to the bone in the correct position; fracture, where the bone around the implant may have broken; dislocation, where two parts of the implant that move against each other are no longer aligned; or the spread of metal debris generated from the metal femur head and metal acetabular cup rubbing and rotating against each other.  For these reasons, revision surgeries have been necessary to remove the faulty Devices.  However, these revision surgeries present enormous risks to the patients because they are technically more difficult than the original surgery to implant the Device, the patient is more at risk of complications and death, and the recovery time is prolonged as compared to the original hip replacement surgery.

**AS A DIRECT AND PROXIMATE RESULT OF BIOMET'S FAILURE TO RECALL THE DEVICE, PLAINTIFF WAS IMPLANTED WITH A DEVICE, AND NOW HAS DEBILITATING PAIN AND WAS REQUIRED TO UNDERGO REVISION SURGERY TO REPLACE THE DEVICE.**

30.     During all material times, Plaintiff has been a resident of the state of Colorado.

31.     On or about July 08, 2002, Plaintiff underwent a right total hip replacement surgery performed by Dr. Jerome Wiedel at University of Colorado Hospital in Denver, Colorado and received a M2A-38 Hip Replacement System Device.

32.     After the surgical implantation of the Device, Plaintiff suffered symptoms including but not limited to increasingly debilitating pain, discomfort, soreness, dysfunction, and loss of range of motion.

33.     Subsequently, on November 06, 2012, Plaintiff was required to undergo revision surgery, which was performed by Dr. Michael R. Dayton at University of Colorado Hospital in Aurora, Colorado to replace the failed Device.

34.     An employee and/or agent of Defendant provided the Device to Dr. Jerome Wiedel, who implanted the device on July 08, 2002, the date of the original right hip replacement surgery.

35.     Beyond merely providing the device to the surgeon, agents of Defendants were hired by Defendants to aggressively promote, distribute, and sell the Device.

36.     Directors, managers, and sales representatives of Defendants received training and education from Defendants, including orthopedic and surgical training, product design rationale for the Device, education regarding proper use of the tools to implant the Device, selection of complementary components to the Device, and training on how to sell the Device to surgeons over hip replacements offered by competitors.

37.     On numerous occasions, Defendants met with orthopedic surgeons, including, on information and belief, with Plaintiff's orthopedic surgeon, to promote the M2a38 Hip Replacement System.  At some or all of these meetings, a representative or representatives of Biomet was present.  During these meeting, Biomet assured the orthopedic surgeons, including

Plaintiff's orthopedic surgeon, that the M2a-38 Hip Replacement System was safe, effective, was the best product on the market, had an excellent track record, had very low wear, would last longer than traditional hip implants, and had a low and acceptable failure rate. Biomet continued to "defend" the Device even after they became aware of numerous and serious complications with it. Biomet did not reveal (and instead concealed) their knowledge of numerous and serious complications and other "bad data" during their meetings with orthopedic surgeons, including Plaintiff's orthopedic surgeon.

38. Plaintiff's revision surgery has subjected him to much greater risks of future complications than he had before the revision surgery. For example, several studies have found that a revision surgery causes a much higher risk of dislocation compared with an original hip replacement surgery. In one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared with 3.9 percent of patients who underwent a original hip replacement surgery. In other words, hip replacement patients who have undergone a revision surgery are almost four times more likely to suffer from a hip dislocation than those who have not. (Phillips CB, *et al*. Incidence rates of dislocation, pulmonary embolism, and deep infection during the first six months after elective total hip replacement. *American Journal of Bone and Joint Surgery* 2003; 85:20–26.)

39. Defendants were instrumental in educating Plaintiff's Orthopedic Surgeon regarding claimed advantages of the product, addressing the questions of the surgeon.

40. Had Plaintiff or Plaintiff's surgeon known that the Device caused injury and had the potential to require revision surgery to remove the device, with no benefit over traditional hip implants, then neither Plaintiff nor Plaintiff's surgeon would have chosen the Device for the hip

implant surgery. Rather, Plaintiff and Plaintiff's surgeon would have opted for the safer and more effective traditional hip implant utilizing a polyethylene liner.

41.     As a direct and proximate result of the implantation of the Device, Plaintiff has suffered significant harm, including but not limited to physical injury and bodily impairment, debilitating lack of mobility, conscious pain and suffering, elevated metal ion levels and loss of earnings. As a result, Plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial.

## FIRST CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY (DESIGN DEFECT)
## AGAINST ALL DEFENDANTS

42.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

43.     At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Device as hereinabove described that was surgically implanted in Plaintiff.

44.     At all times herein mentioned, the Device was in an unsafe, defective, and inherently dangerous condition for users such as Plaintiff that had the device surgically implanted.

45.     The Device was in an unsafe, defective, and inherently dangerous condition at the time it left Defendants' possession.

46.     At all times herein mentioned, the Device was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was designed, produced, manufactured, sold, distributed, and marketed by Defendants.

47.     The Device's unsafe, defective, and inherently dangerous condition was a cause of injury to Plaintiff.

48.     The Device failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

49.     Plaintiff's injuries resulted from use of the Device that was both intended and reasonably foreseeable by Defendants.

50.     At all times herein mentioned the Device posed a risk of danger inherent in the design which outweighed the benefits of that design.

51.     At all times herein mentioned, the Device was defective and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

52.     At all times herein mentioned, the Defendants knew, or should have known, that the Device was in a defective condition, and was and is inherently dangerous and unsafe.

53.     At the time of the implantation of the Device into Plaintiff, the aforesaid product was being used for the purposes and in a manner normally intended, namely for use as a hip replacement device.

54.     Defendants, with this knowledge, voluntarily designed their Device in a dangerous condition for use by the public and, in particular, Plaintiff.

55.     Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

56.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers and to

Plaintiff, in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

57.     As a direct and proximate result of Defendants' placement of the defective Device into the stream of commerce, Plaintiff experienced and/or will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for revision surgery to replace the device with the attendant risks of complications and death from such further surgery.

58.     Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

59.     In performing the foregoing acts and omissions, Defendants acted despicably, fraudulently, and with malice and oppression so as to justify an award of punitive and exemplary damages.

<u>SECOND CAUSE OF ACTION</u>
**STRICT PRODUCTS LIABILITY (INADEQUATE WARNING)**
**AGAINST ALL DEFENDANTS**

60.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

61.     Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Device.

62.     The Device placed into the stream of commerce by Defendants was defective due to inadequate warnings, because Defendants knew or should have known that the Device could fail early in patients and therefore give rise to physical injury, pain and suffering,

debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery, but failed to give consumers adequate warning of such risks.

63.    The Device is unreasonably dangerous because it was sold to Plaintiff without adequate warnings regarding, *inter alia,* the propensity of the Device to loosen and cause serious pain and necessitate additional surgery as well its propensity to generate metal debris resulting in metallosis and increased cobalt and chromium levels and damage to tissues and bone in patients.

64.    Further, the Device placed into the stream of commerce by Defendants was surgically implanted in a manner reasonably anticipated by Defendants.

65.    As a direct and proximate result of Defendants' placement of the defective Device into the stream of commerce, Plaintiff experienced and/or will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery.

66.    Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

67.    In performing the foregoing acts and omissions, Defendants acted despicably, fraudulently, and with malice and oppression so as to justify an award of punitive and exemplary damages.

### THIRD CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY AGAINST ALL DEFENDANTS

68.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

69.     Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Device.

70.     Defendants expressly warranted that the Device was a safe and effective hip replacement system and that it would last longer than a traditional polyethylene lined implant and was thus appropriate for young and active patients.

71.     Indeed, as set forth in detail above, Defendants made numerous representations about the quality, safety, effectiveness and expected lifetime of the Device which form express warranties.

72.     The Device placed into the stream of commerce by Defendants did not conform to these express representations because they failed early thereby giving rise to unnecessary physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the Device with the attendant risks of complications and death from such further surgery.

73.     As a direct and proximate result of Defendants' breach of express warranties regarding the safety and effectiveness of the Device, Plaintiff experienced and/or will experience significant damages, including but not limited to physical injury, economic loss, pain and suffering, and the need for further surgery to replace the faulty Device, and will continue to suffer such damages in the future.

74.     In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover punitive damages.

**FOURTH CAUSE OF ACTION**

## VIOLATION OF THE CONSUMER PROTECTION ACT
## AGAINST ALL DEFENDANTS

75.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

76.     Defendants unfairly, unconscionably, and deceptively advertised, marketed, sold, and represented the Device as a high-quality, safe and effective hip replacement system to Plaintiff and Plaintiff's physicians.

77.     Before they advertised, marketed, sold and represented the Device that was implanted in Plaintiff, Defendants knew or should have known of the unreasonable dangers and serious health risks that such a metal-on-metal total hip replacement system posed to patients like Plaintiff.

78.     Plaintiff purchased and used the Device for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of the consumer protection laws.

79.     Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for the Device, and would not have incurred related medical costs and injury.

80.     Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiff for the Device that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

81.     Unfair methods of competition or deceptive acts or practices that were prescribed by law, including the following

            (a) Representing that goods or services have characteristics, ingredients, uses, benefits or quantities that they do not have;

(b) Advertising goods or services with the intent not to sell them as advertised; and

(c) Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

82.     Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell the Device. Each aspect of Defendants' conduct combined to artificially create sales of the Device.

83.     Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion and sale of the Device.

84.     Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the Device, and would not have incurred related medical costs.

85.     Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and deceptive acts and trade practices in violation of the state consumer protection statutes listed.

86.     Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes, as listed below.

87.     Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the Consumer Protection Act, Wash. Rev. Code § 19.86.010, *et seq.*

88.     Under the statute listed above to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

89.     Defendants violated the statutes that were enacted in these states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising, by knowingly and falsely representing that the Defice was fit to be used for the purpose for which it was intended, when in fact the Device was defective and dangerous, and by other acts alleged herein. These representations were made in uniform promotional materials.

90.     The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted in the states to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising.

91.     Defendants had actual knowledge of the defective and dangerous condition of the Device and failed to take any action to cure such defective and dangerous conditions.

92.     Plaintiff and the medical community relied upon Defendants' misrepresentations and omissions in determining which hip implant device to use and recommend.

93.     Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

94.     By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable losses and damages.

95.     As a direct and proximate result of Defendants' violations of the states' consumer protection laws, Plaintiff has sustained economic losses and other damages and is entitled to statutory and compensatory, damages in an amount to be proven at trial.

96.     As specifically described in detail above, Defendants knew that the Device subjected patients to early failure, painful and harmful physical reactions to toxic metallic particles and ions, death of tissue, bone loss and the need for explants and revision surgery.

97.     As a direct and proximately result of Defendants' representations, Plaintiff has experienced and/or will experience significant damages, including but not limited to permanent physical injury, economic loss, pain and suffering and the need for revision surgery to repair the physical damage to Plaintiff caused by the Device.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE AGAINST ALL DEFENDANTS

98.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

99.     Defendants had a duty to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the Device into the stream of commerce, including a duty to assure that the device would not cause those who had it surgically implanted to suffer adverse harmful effects from it.

100.    Defendants failed to exercise reasonable care in designing, researching, manufacturing, marketing, supplying, promoting, sale, testing, quality assurance, quality control, and/or distribution of the Device into interstate commerce in that Defendants knew or should have known that those individuals that had the device surgically implanted were at risk for suffering harmful effects from it, including but not limited to, partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery.

101.    The negligence of Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

(a)     Negligently designing the Device in a manner which was dangerous to those individuals who had the device surgically implanted;

(b)     Designing, manufacturing, producing, creating, and/or promoting the Device without adequately, sufficiently, or thoroughly testing it;

(c)     Not conducting sufficient testing programs to determine whether or not the aforesaid Device was safe for use;

(d)     Defendants herein knew or should have known that the Device was unsafe and unfit for use by reason of the dangers to its users;

(e)     Selling the Device without making proper and sufficient tests to determine the dangers to its users;

(f)     Negligently failing to adequately and correctly warn Plaintiff or Plaintiff's physicians, hospitals and/or healthcare providers of the dangers of Device;

(g)     Negligently failing to recall their dangerous and defective Device at the earliest date that it became known that the device was, in fact, dangerous and defective;

(h)     Failing to provide adequate instructions regarding safety precautions to be observed by surgeons who would reasonably and foreseeably come into contact with, and more particularly, implant the Device into their patients;

(i)     Negligently advertising and recommending the use of the Device despite the fact that Defendants knew or should have known of its dangerous propensities;

(j)     Negligently representing that the Device offered was safe for use for its intended purpose, when, in fact, it was unsafe;

(k)     Negligently manufacturing the Device in a manner which was dangerous to those individuals who had it implanted;

(l)     Negligently producing the Device in a manner which was dangerous to those individuals who had it implanted;

(m)    Negligently assembling the Device in a manner which was dangerous to those individuals who had it implanted;

(n)     Defendants under-reported, underestimated and downplayed the serious danger of the Device.

(o)     Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of the Device in that they:

(p)     Failed to use due care in designing and manufacturing the Device so as to avoid the aforementioned risks to individuals that had the Devices surgically implanted;

(q)     Failed to accompany their product with proper warnings;

(r)     Failed to accompany their product with proper instructions for use;

(s)     Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the Device;

(t)     Willful, reckless and wanton misconduct in allowing this dangerous device to be implanted in human beings without sufficient testing and with express knowledge of enhanced risks, and;

(u)     Were otherwise careless and/or negligent.

109.    Despite the fact that Defendants knew or should have known that the Device caused harm to individuals that had the device surgically implanted, Defendants continued to market, manufacture, distribute and/or sell the Device.

110.    Defendants knew or should have known that consumers such as Plaintiff would suffer foreseeable injury, and/or be at risk of suffering injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

111.    Defendants' negligence was the proximate cause of Plaintiff's physical, mental and emotional injuries and harm, and economic loss which Plaintiff has suffered and/or will continue to suffer.

112.    By reason of the foregoing, Plaintiff experienced and/or will experience severe harmful effects, including but not limited to, partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasing in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for a revision surgery to replace the device with the attendant risks of complications and death from further surgery.

113.    Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

In performing the foregoing acts and omissions, Defendants acted despicably, fraudulently, and with malice and oppression so as to justify an award of punitive and exemplary damages.

## SIXTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### AGAINST ALL DEFENDANTS

114.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

115.    Defendants supplied false information to the public, to Plaintiff and to Plaintiff's physicians regarding the high-quality, safety and effectiveness of the Device. Defendants provided this false information to induce the public, Plaintiff and Plaintiff's physicians to purchase and implant a Device.

116.    Defendants knew or should have known that the information they supplied regarding the purported high-quality, safety and effectiveness of the implant would induce Plaintiff and Plaintiff's physicians to purchase and use a Device was false and misleading.

117.    Defendants were negligent in obtaining or communicating false information regarding the purported high-quality, safety and effectiveness of the Device.

118.    Plaintiff and Plaintiff's physicians relied on the false information supplied by Defendants to Plaintiff's detriment by causing the Device to be purchased and implanted in Plaintiff.

119.    Plaintiff and Plaintiff's physicians were justified in their reliance on the false information supplied by Defendants regarding the purported high-quality, safety and effectiveness of the Device.

120.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff experienced and/or will experience significant damages, including but not limited to permanent physical injury, economic loss, pain and suffering and the need of revision surgery to repair the physical damage to Plaintiff caused by the Device.

<u>SEVENTH CAUSE OF ACTION</u>
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**AGAINST ALL DEFENDANTS**

121.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

122.     Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Device.

123.     At the time Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Device, Defendants knew the use for which the Device was intended, and impliedly warranted the Device to be of merchantable quality.

124.     Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the Device was of merchantable quality.

125.     Contrary to Defendants' implied warranties, the Device was not of merchantable quality or safe for the ordinary purposes for which it was to be used, because the Device was unreasonably dangerous and/or not reasonably fit for its intended, anticipated or reasonably foreseeable use as described above.

126.     As a direct and proximate result of Defendants' breach of implied warranties regarding the safety and effectiveness of the Device, Plaintiff experienced and/or will experience significant damages, including but not limited to physical injury, economic loss, pain and suffering, and the need for further surgery to replace the faulty device, and will continue to suffer such damages in the future.

127.     In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover punitive damages.

## EIGHTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE AGAINST ALL DEFENDANTS

128.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows:

129.    Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Device.

130.    At the time Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Device, Defendants knew the use for which the Device was intended, and impliedly warranted the Device to be of safe for such use.

131.    Plaintiff reasonably relied upon the skill and judgment of Defendants as to whether the Device was safe for its intended use.

132.    Contrary to Defendants' implied warranties, the Device was not of safe for its intended use or fit for the particular purpose for which it was designed, manufactured, tested, distributed or sold – for use and implantation as a total hip replacement system, because the Device was unreasonably dangerous and/or not reasonably fit for its intended, anticipated or reasonably foreseeable use as described above.

133.    As a direct and proximate result of Defendants' breach of implied warranties regarding the safety and effectiveness of the Device, Plaintiff experienced and/or will experience significant damages, including but not limited to physical injury, economic loss, pain and suffering, and the need for further surgery to replace the faulty device, and will continue to suffer such damages in the future.

134.    In taking the actions and omissions that caused these damages, Defendants were guilty of malice, oppression and fraud, and Plaintiff is therefore entitled to recover punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

1.      Judgment in favor of Plaintiff and against all Defendants, for damages in such amounts as may be proven at trial;

2.      Compensation for both economic and non-economic losses, including but not limited to medical expenses, loss of earnings, disfigurement, pain and suffering, mental anguish, and emotional distress, in such amounts as may be proven at trial;

3.      Punitive and/or exemplary damages in such amounts as may be proven at trial;

4.      Restitution and disgorgement of all revenue that Defendants have obtained through the manufacture, marketing, sale and administration of the Device;

5.      Attorneys' fees and costs;

6.      Pre- and post-judgment interest; and

7.      Any and all further relief, both legal and equitable, that the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all claims asserted in this Complaint.

Dated:   December 05, 2012

Respectfully submitted,

AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
Attorneys for Plaintiff

*s/ R. Jason Richards*
R. Jason Richards
CO Bar #: 32791
Douglass A. Kreis
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Fax: 850-916-7449
E-mail: jrichards@awkolaw.com

Peter J. Flowers (*Pro hac vice application to be filed*)
PJF@Foote-Meyers.com
Craig S. Mielke (*Pro hac vice application to be filed*)
CSM@Foote-Meyers.com
Foote, Meyers, Mielke & Flowers, LLC.
3 North Second Street, Suite 300
St. Charles, Illinois 60174
Phone: (630) 232-6333

Joseph A. Osborne, Esq. *(Pro hac vice application to be filed)*
jaosborne@babbitt-johnson.com
Babbitt, Johnson, Osborne & Le Clainche, P.A.
1641 Worthington Road, Suite 100
West Palm Beach, FL 33409
Phone: (561) 684-2500